IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| BASILE BAUMANN PROST COLE & ASSOCS., INC, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO.: WDQ-11-2478 |
| BBP & ASSOCS. LLC, *et al.*, | * | |
| Defendants. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

MEMORANDUM OPINION

Basile Baumann Prost Cole & Associates, Inc. (the "Corporation") sued BBP & Associates LLC (the "LLC"), James Prost, and Ralph Basile (collectively, the "Defendants") for trademark infringement and other claims. For the following reasons, the Court will deny the Defendants' motion for summary judgment, and the Corporation's cross-motion for summary judgment.[1]

I. Background[2]

In 1990, Basile, Prost, and Wilbur Baumann formed an economics and real estate consulting firm called Basile Baumann

---

[1] The Court will grant the Corporation's unopposed motion to seal an exhibit to its reply, ECF No. 29.

[2] On cross motions for summary judgment, "each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

Prost & Associates, Inc.  Ralph Basile Decl. ¶ 2; James Prost
Dep. 11:7-10, Dec. 2, 2011.  Based in Annapolis, Maryland, the
company advised local, state, and federal agencies.  Answer ¶ 1;
Basile Decl. ¶ 3; Prost Dep. 31:1-19.  The company referred to
itself by the acronyms "BBPA" and "BBP."  Prost Dep. 19:7-20:4;
Basile Decl. ¶ 4.  In 1995, the company launched the website
www.bbpa.com.  Answer ¶¶ 29-30.

As the business developed, Basile and Prost worked mostly
with state and local governments and institutions.  Basile Decl.
¶ 3.  Baumann devoted most of his time to projects with the U.S.
Navy.  *Id.*

In 2006, Baumann sold his share of the company to R. Thomas
Cole, *see* Answer ¶ 15, and the company changed its name to Basile
Baumann Prost Cole & Associates, Inc. (hereinafter the
"Corporation"), *see* Prost Dep. 29:2-10; Basile Decl. ¶ 4.  The
Corporation began to refer to itself as "BBPC," *see* Answer ¶ 31,
and developed a logo using that acronym:



ECF No. 23-1, Ex. O.  The logo appeared on the Corporation's
business cards:



ECF No. 22-1, Ex. Q.  The parties dispute whether the

Corporation continued to refer to itself by the acronyms "BBPA"

or "BBP."[3]  Its website remains www.bbpa.com.

The Corporation's marketing materials have included lists

of awards the firm has received, *see* ECF No. 23-1, Ex. FF, and

client testimonials, such as:

> BBPC displayed aggressive, well organized efforts to
> expedite the project . . . . BBPC went out of their
> [sic] way . . . at short notice to ensure financial
> documents were finalized.
>
>   Phil Wills, Booz Allen Hamilton
>
> I have been impressed with the quality of BBPCA's
> services as well as their [sic] real estate and joint
> development expertise . . .
>
>   Douglas Hale, Joint Development, Washington Metro
>   Area Transit Authority
>
> [T]he firm's impeccable reputation in the industry
> make[s] Basile Baumann Prost & Associates, Inc.,
> uniquely qualified . . .

---

[3] Basile swore that the Corporation stopped using "BBP" and
"BBPA" shortly after Cole was added to the Corporation's name.
Basile Decl. ¶ 4.  Cole swore that the Corporation continued to
use "BBP" and "BBPA," especially among clients "with
longstanding relationships with the firm."  Cole Decl. ¶¶ 5-6.

> Gary A. Shepard, Administrator, Pioneer Valley Transit Authority

ECF No. 23-1, Ex. CC; Cole Decl. ¶ 36.

By 2009, Basile and Prost had decided that they no longer wanted to work with Cole. Prost Dep. 72:19. The Corporation had 25 employees and its total annual sales exceeded $10 million. Prost Dep. 34:8-17; ECF No. 23-1, Ex. H. Basile and Prost continued to work with smaller state and local governments, and Cole worked mainly with the U.S. Navy. R. Thomas Cole Dep. 120:2-15, Dec. 14, 2011.

On December 31, 2009, Basile, Prost, Cole, and the Corporation entered a Stock Redemption Agreement, whereby the Corporation agreed to redeem Basile and Prost's shares in exchange for $1.8 million and certain assets, including:

- 83 jobs,

- 138 "leads and proposals," and

- "[a]ll goodwill created on all past contracts and clients by Basile and Prost [within the last four years] to include but not be limited to any and all use of job qualifications and materials and job references for Basile and Prost's contracts and clients."

ECF No. 22-1, Ex. 2 at §§ 1, 2.1.1, 2.2.1, Schedule 2.2.1 (Revised). The Corporation "retain[ed] all [other] assets, properties[,] and rights," including the company name, office

4

location and lease, telephone number, domain name and website, two-thirds of the Corporation's staff, and 70 percent of its contracts by revenue.[4]  A "Non-Competition" covenant provided that, for four years, Basile and Prost would not "in any manner . . . actively solicit business from any party who [wa]s currently a prospective client or ha[d] been, at any time during the four . . . years prior to the date of [the] Agreement, an active client . . . of . . . Cole and the Corporation."  *Id.* at § 8.1.  The parties agreed that the Stock Redemption Agreement would be interpreted under Maryland law.  *Id.* at § 11.5.

A separate transfer agreement signed the same day provided that the Corporation was transferring to the LLC its "interests, rights[,] and obligations in certain existing client contracts." ECF No. 22-1, Ex. 2 at 47.

In an "Addendum to [the] Closing Documents," the parties added the following provision to the Stock Redemption Agreement:

> GOOD WILL. During the Non-Competition Period[,] Cole and [the] Corporation shall not use Basile [and] Prost's Good Will created on all of Basile and Prost's

---

[4] *Id.* at § 2.2.1; Cole Decl. ¶ 44.  The parties dispute the number of clients the Corporation retained.  The Defendants contend that 365--98 percent--of the Corporation's customers "were transferred . . . to Basile and Prost."  ECF No. 27 at 8. The Corporation asserts that the figure is "patently erroneous" because the Corporation transferred only 83 jobs, and "multiple jobs were for the same customer."  ECF No. 28 at 8.  The Corporation further argues that the 365 clients that the Defendants cite were Basile and Prost's putative former customers, for which the Corporation agreed not to compete for four years.  *Id.*

contracts and clients [in the last four years], to include but not be limited to any and all use of job qualifications and materials and job references for Basile and Prost's contracts and clients.

During the Non-Competition Period[,] Cole and [the] Corporation shall not use Basile [and] Prost's Good Will and job qualifications and materials and job references in any further solicitations or proposals to state and local governmental agencies and entities and assigns, etc[.]

However, Cole and [the] Corporation shall retain all of Cole and the Corporation's Department of Defense, Air Force, Army, Navy[,] and Coast Guard Good Will, and may use all of their Good Will and job qualifications and materials for their future solicitations or proposals, including Basile [and] Prosts's job qualifications and materials for Army and Navy and Air Force work assignments.

During the Non-Competition Period Basile [and] Prost shall not use Cole and the Corporation's Good Will created on all of Cole's past contracts and clients [in the last four years], to include but not be limited to any and all use of job qualifications and materials and job references for Cole's contracts and clients.

ECF No. 22-1, Ex. 2 at 49.  The parties further provided that

Cole and [the] Corporation [would] retain all of [their] Department of Defense, Air Force, Army, Navy and Coast Guard Good Will, and [would be able to] use all of their Good Will and job qualifications and materials for their federal practice areas, and [would] continue to work on Department of Defense, Air Force, Army, Navy and Coast Guard jobs . . . free from competition from [Basile and Prost].

[Basile and Prost] [would] retain all of [their] state and local Good Will and [would be able to] use all of their Good Will and job qualifications and materials for their state and local practice areas and [would] continue to work on state and local government entities and assigns['] jobs . . . free from competition by Cole and the Corporation as to all of

[Basile and Prost's] protected clients[.]

*Id.* at 49-50.

On January 1, 2010, Basile and Prost formed BBP & Associates LLC (hereinafter the "LLC"), an "economics and real estate development advisory firm" headquartered in Annapolis.[5] For some time after its formation, the LLC shared office space with the Corporation. *See* ECF No. 22-1, Ex. 3.

The LLC refers to itself by the acronyms "BBP" and "BBP LLC," *see* Answer ¶ 39, and developed the following logos:





ECF No. 23-1, Ex. P, UU. The first logo has appeared on the LLC's business cards:

---

[5] Basile Decl. ¶ 8; Answer ¶¶ 6, 24. Baumann has never been affiliated with the LLC. Answer ¶ 22. Prost testified that "BBP" was "an acronym [that was] often associated with [Basile] and [Prost]." Prost Dep. 153:1-6.



ECF No. 23-1, Ex. R.  On January 4, 2010, the LLC registered the

Internet domain name "bbpallc.com," and later launched the

website www.bbpallc.com.  Basile Decl. ¶ 10.

On January 5, 2010, an LLC employee asked Basile and Prost

to comment on a proposed statement distinguishing the LLC from

the Corporation:

> BBP and Associates LLC, established in 2009, is a
> legal successor to Basile Baumann Prost & Associates
> (BBPA), which was founded in 1991.[6]

Basile responded that

> [i]f you must say when we were organized, better
> wording might be 'BBPC was founded in 1990, and in
> 2009 was legally restructured, resulting in the
> formation of BBP and Associates LLC.'

Email from Ralph Basile to Taylor Yewell, Jim Prost & David

Starnes (Jan. 5, 2010 11:02 a.m.).

Sometime after January 8, 2010, the LLC sent an

announcement to Basile and Prost's industry contacts and

---

[6] Email from Taylor Yewell to Ralph Basile, Jim Prost & David
Starnes (Jan. 5, 2010 10:49 a.m.).  Yewell identified himself in
his email signature as a senior associate for the Corporation,
*see id.*, but was listed as an LLC employee in the announcement
the LLC sent about moving to a new location, *see* ECF No. 23-1,
Ex. NN at 1.

current, former, and potential clients, stating that "BBP &

Associates, LLC (BBP LLC) ha[d] moved to a new location!"  ECF

No. 23-1, Ex. NN at 1; Prost Dep. 177:1-19; Basile Dep. 332:22-

333:17.

    On January 18, 2010, the LLC sent the following mass email:

    Ralph Basile and Jim Prost are pleased to announce the
    establishment of BBP & Associates, LLC (BBP LLC).  The
    firm continues to service all of the state, local,
    private[,] and non-direct Department of Defense work
    conducted by the firm that they founded in 1990.  That
    firm, which was reorganized at the end of 2009 and is
    trading as BBPC, continues to service the remaining
    direct contract with the Department of the Navy.

    The reorganized BBP LLC includes Mess[]rs. Basile and
    Prost and all of their experienced professional staff.
    BBP LLC continues to offer the highest quality
    development advisory services with a focus on serving
    state and local governments and agencies, public and
    quasi-public institutions and the private sector.

ECF No. 22-1, Ex. 5 at 6.  On January 19, 2010, one of the

Corporation's past clients forwarded the email to Cole and

asked, "Will you change name???"  *Id.*

    Janet Sumner, the LLC's financial manager,[7] testified that

in early 2010, several of the LLC's clients sent payments to the

Corporation, which would deposit the money and "cut a check" to

the LLC.  ECF No. 22-1, Ex. TT, Janet Quigly Sumner Dep. 47:7-

49:8, Jan. 10, 2012.

    On February 25, 2010, the LLC gave a presentation on

---

[7] Sumner used to be the Corporation's financial manager.  *See* ECF
No. 23-1 at 31.

economic development in the North East Durham neighborhoods of North Carolina. *See* ECF No. 23-1, Ex. MM. In the presentation, the LLC used its green "BBP" logo and described itself as a "[n]ationally-[r]ecognized [f]irm" with "[p]rojects in 47 states," and "[four] countries[,] serving over 1,250 . . . [c]lients." *Id.* at 3.

On February 26, 2010, the LLC responded to a request for proposals for a retail development plan for Newport News, Virginia. ECF No. 23-1, Ex. LL. The LLC's proposal used the same logo and described the LLC as a "nationally-recognized economic and real estate development advisory services firm" that had "caused construction of over $8 billion of development in 47 states and [five] countries while assisting over 1,250 public and private sector clients." *Id.* at 1-2.

On April 21, 2010, the Corporation received mail from the City of Orlando that was intended for the LLC. Cole Decl. ¶ 28.

On May 6, 2010, Basile told Cole that the Corporation had violated the non-compete provision of the Stock Redemption Agreement by improperly soliciting local government work, and listing on its website two projects that Basile and Prost had done in the past four years. ECF No. 22-1, Ex. 7 at 1, 3. Shortly thereafter, the Corporation removed the two projects from its website. Basile Decl. ¶ 11.

On May 11, 2010, the Corporation received a check, payable

to the Corporation, from one of the clients whose contract was assigned to the LLC under the Stock Redemption Agreement. Cole Decl. ¶ 29. The Corporation deposited it and sent a check in the same amount to the LLC. *Id.*

On May 24, 2010, the Corporation asked Basile and Prost to "discontinue use of the BBP service mark, change the appearance of [the LLC's] website[,] and adopt a replacement name that is not confusingly similar to [the Corporation's]." ECF No. 22-1, Ex. 8, Letter from Michael J. Bevilacqua to Ralph Basile & James Prost (May 24, 2010). The Corporation asserted that it had used the marks BBP and BBPA from 1993 through 2006, and the "design of [the LLC's] website [was] very similar to" the Corporation's because it used "the same color scheme and very similar borders." *Id.* The Corporation asserted that, because the Corporation and the LLC offered "substantially similar services," and Basile and Prost had been principals of both entities, there was a "very strong likelihood that many of [the LLC's] customers and potential customers [would] be confused as to the origin, source[,] and identity of the services offered by [the Corporation] . . . and [the LLC]." *Id.*

On May 31, 2010, the LLC responded that the Corporation had abandoned use of the acronyms "BBP" and "BBPA," and any confusion about the entities had been caused by the Corporation, which had altered its logo and website after the LLC was formed.

11

ECF No. 22-1, Ex. 9, Letter from Daniel J. Mellin to Michael J. Bevilacqua (May 31, 2010).  Nonetheless, the LLC stated that it had decided to alter its website and logo.  *Id.*  The new logo used gold lettering on a blue background, incorporated the letters "LLC," and used the Helvetica Neue font instead of Menion semibold:



*Id.*; ECF No. 23-1, Ex. 56.[8]

On July 9, 2010, RKG Associates, Inc. ("RKG") submitted a proposal for an economic diversification plan for the Aquidneck Island (R.I.) Reuse Planning Authority (the "Planning Authority"), and listed the LLC as its subcontractor.  *See* ECF No. 34-1, Tina Dolen Decl., Ex. A.  The proposal referred to the LLC as "Basile Baumann Prost & Associates, LLC" and "BBP LLC." *Id.* at 10.  It described the LLC as having "caused construction

---

[8] By July 30, 2010, the LLC had modified its logo again:



ECF No. 23-1, Ex. V.

of over $7 billion of development in 47 states and [four]
countries while assisting over 1,100 public sector clients meet
their development objectives." *Id.*  It also stated that the LLC
had "been involved with several real estate projects that have
been guided to fruition, initiated as a result of downsizing of
operations by Defense Department entities under the Base
Realignment and Closure (BRAC) actions nationwide." *Id.*

The RKG proposal also included a brochure produced by the
LLC called "Government Asset Management and Privatization
Services." *See* ECF No. 34-1, at 77-82.  The brochure listed
many BRAC projects purportedly completed by the LLC. *Id.*  In
fact, the projects were completed by the Corporation, when
Basile was a principal there.  Tina Dolen Decl. ¶ 15.

The Corporation also submitted a proposal, under the name
"Basile Baumann Prost Cole & Associates, Inc."  ECF No. 34-1 ¶
16.  The Planning Authority awarded the contract to RKG, in part
because RKG's "experience with BRAC, and specifically with the
Navy, was important to the . . . selection of a team for the
project."[9]

---

[9] Tina Dolen Decl. ¶¶ 13, 20. On December 12, 2011, Cole wrote to
a representative of the Planning Authority to ask how another
firm had been able to obtain a copy of the Corporation's sealed
bid.  *Id.*, Ex. B.  The Planning Authority representative
responded that she "remember[ed] [Cole's] firm and another who
submitted a proposal having almost the same name." *Id.*  She
"[did]n't know if that [had] caused any confusion amongst the
proposals." *Id.*

13

On August 18, 2010, the LLC responded to the City of Orlando's request for proposals for consulting services. *See* ECF No. 23-1, Ex. RR. The LLC's proposal stated that the LLC was a "national economics and real estate development advisory firm" that had been "[r]eorganized at the end of 2009." *Id.* at 7. It further provided that the LLC was "neither a parent nor a subsidiary in a group of firms/agencies." *Id.*

On February 15, 2011, the LLC responded to the Annapolis Economic Development Corporation's request for proposals for a retail market study in Annapolis. ECF No. 23-1, Ex. JJ. On the first page of its proposal, the LLC described itself as "a nationally-recognized economic development, real estate and development advisory services firm." *Id.* at 2.

> In all, we have caused construction of over $11 billion of development in 47 states and 5 countries while assisting over 1,200 public and private sector clients meet their development objectives. We also have extensive experience in Annapolis after 30-years of operating our business from a headquarters located in Annapolis, now in the West Annapolis area.

*Id.* The LLC had not done business outside the United States or in 47 states, nor had it entered contracts worth $11 billion. Basile Dep. 226:19-227:4-18, 229:8-11.

On March 7, 2011, the Annapolis Economic Development Corporation announced that it had awarded the bid to the LLC, which had been "[b]ased in Annapolis for over three decades," and

> ha[d] facilitated over $11 [b]illion dollars of
> development and ha[d] worked with notable local
> clients such as Jerry Parks and the U.S. Naval Academy
> as well as performed previous studies such as Outer
> West Street Revitalization and Land Use Assessment.

ECF No. 23-1, Ex. KK.  Jerry Parks and the U.S. Naval Academy

were clients of the Corporation.  Cole Decl. ¶ 43.

On June 3, 2011, a prospective client forwarded the

Corporation an email newsletter that he had received from the

LLC describing various projects, including one in Baton Rouge,

Louisiana.  Cole Decl. ¶ 30.  Addressing the Corporation, the

prospective client wrote that he had "noted your work in Baton

Rouge."  *Id.*

> On its website, the LLC has described itself as

> one of the leading development consulting firms
> nationwide, assisting federal entities and state and
> local governments with economic analysis and real
> estate development expertise.  We have caused
> construction of over $7 billion of development in 47
> states and 4 countries while assisting over 1,100
> public sector clients meet their development
> objectives.

ECF No. 23-1, Ex. N.

Before September 2011, the LLC's website listed about 600

clients.  ECF No. 23-1, Ex. W; Answer ¶ 52.  After the

Corporation filed this lawsuit, the LLC added the following note

at the bottom of the client list:

> *Includes locations where work was managed and/or
> completed by senior BBP LLC staff, including
> assignments by Basile and Prost when they were
> Principals and senior technical staff at other

consulting firms.

ECF No. 23-1, Ex. W; ECF No. 22-1 at 21.   In August 2011,
the LLC's website stated that the LLC "ha[d] provided real
estate development assistance to . . . literally hundreds
of clients at the state and local level."[10]   As of January
6, 2012, the LLC had worked on 70 to 80 assignments, and
had provided services to "far fewer" clients.   Basile Dep.
229:12-17, 231:7-13.

In August 2011, the LLC website included the Government
Asset Management and Privatization Services Brochure that had
been submitted in the July 2010 RKG proposal to the Planning
Authority.   *See* Answer ¶ 57.   It provided that:

> [t]he company's focus on structuring and implementing
> real estate developments ha[d] produced a number of
> "firsts" in federal government privatization programs,
> including:
>
> - First   Zero-Cast   Rural   Economic   Development
>   Conveyance: Army – Tooele, UT
>
> - First   Privatization-in-Place   effort   involving
>   operations at a military installation designated
>   for closure under BRAC: Louisville, KY
>
> - First attempt to accomplish space needs by
>   exchanging land for private construction of built
>   space: Army – Fort Belvoir EPG, VA
>
> - First transfer of unremediated CERCLA/Superfund
>   property (Section 334 conveyance): Army – Tooele,

---

[10] ECF No. 23-1, Ex. X at BBPC 1523.   The Corporation asserts
that the LLC removed the statement after the lawsuit was filed.
ECF No. 23-1 at 8.

UT[11]

Each of these "firsts" was accomplished before the LLC was formed on January 1, 2010. *See* Answer ¶ 60. A current version of the brochure lists 45 projects, eight of which were completed by the LLC. ECF No. 23-1, Ex. Y; Basile Dep. 245:8-246:5. The rest were done by the Corporation. Cole Decl. ¶ 41.

Under the "Testimonials" tab, the LLC's website has listed endorsements that are verbatim to those in the Corporation's marketing materials, or substitute "BBP LLC" or "BBP & Associates, LLC" for the entity named in the Corporation's testimonials. ECF No. 23-1, Ex. BB, CC. Examples are:

> BBP LLC displayed aggressive, well organized efforts to expedite the project . . . . BBP LLC went out of their [sic] way . . . at short notice to ensure financial documents were finalized.
>
> Phil Wills, Booz Allen Hamilton
>
> I have been impressed with the quality of BBP LLC's services as well as their [sic] real estate and joint development expertise . . .
>
> Douglas Hale, Joint Development, Washington Metro Transit
>
> [T]he firm's impeccable reputation in the industry make[s] BBP & Associates, LLC, uniquely qualified . . .
>
> Gary A. Shepard, Administrator, Pioneer Valley Transit Authority[12]

---

[11] ECF No. 23-1, Ex. X at 3-4.

[12] ECF No. 23-1, Ex. BB. After the Corporation sued, the LLC changed these testimonials to refer to Basile and Prost:

Of the 36 testimonials on the LLC's website, only three did not

originally appear in the Corporation's marketing materials. *See*

ECF No. 23-1, Ex. CC, DD.

Under a tab called "Awards & Recognitions," the LLC's

website lists the same awards as those in the Corporation's

marketing materials. *See* ECF No. 23-1, Ex. EE, FF.  The LLC's

website presents the list in the same order and font, and

---

[Basile] displayed aggressive, well organized efforts to
expedite the project . . . . [Basile] went out of their
[sic] way . . . at short notice to ensure financial
documents were finalized.

   Phil Wills, Booz Allen Hamilton

I have been impressed with the quality of [Prost's]
services as well as their [sic] real estate and joint
development expertise . . .

   Douglas Hale, Joint Development, Washington Metro Transit

[T]he firm's impeccable reputation in the industry make[s]
[Prost] uniquely qualified . . .

   Gary A. Shepard, Administrator, Pioneer Valley Transit
   Authority

ECF No. 23-1, Ex. DD.  Below the testimonials, the LLC stated
that they referred to

   work managed and/or completed by senior BBP LLC staff,
   including assignments by Basile and Prost when they were
   Principals and senior technical staff at other consulting
   firms

*Id.*

18

accompanied by the same photos.[13]

On its website and in presentations, the LLC has represented that it existed before its January 1, 2010 formation.  Under the "Projects" tab of its website, the LLC states that "BBP LLC is proud to [have] be[en] providing services for 13 years now to the City of Long Branch[.]" www.bbpallc.com/Projects.asp (last visited on June 1, 2012). Sometime after January 1, 2010, Basile spoke at a conference of the International Economic Development Council and stated that the LLC had been established in 1990.  ECF No. 23-1, Ex. II.

Since Basile and Prost's departure, the Corporation has continued to provide "real estate development, economics[,] and financial advisory services," primarily to the U.S. Navy.  *See* www.bbpa.com/about-us (last visited June 1, 2012); Cole Dep. 160:14-18.  As of December 14, 2011, the Corporation had added three new clients besides the Navy.  Cole Dep. 160:14-18.

On September 2, 2011, the Corporation sued, alleging

_____

[13] *Id.*, Ex. FF.  Since this lawsuit has been filed, the LLC has added an asterisk that

> [a]ll projects referenced indicate work managed and/or completed by senior BBP LLC staff, including assignment by Basile and Prost when they were Principals and senior technical staff at other consulting firms

*See* www.bbpallc.com/pdf/Awards.pdf (last visited June 1, 2012).

violations of the Lanham Act[14] and the Anticybersquatting

Consumer Protection Act (the "ACPA"),[15] and common law trademark

infringement, unfair competition, and conversion and/or

misappropriation.[16]

On January 25, 2012, the Defendants moved for summary

judgment on all counts.  ECF No. 22.  On February 13, 2012, the

Corporation opposed the Defendants' motion, and moved for

summary judgment on Count I (Lanham Act trademark infringement).

ECF No. 23.  On March 1, 2012, the Defendants filed a reply in

further support of their motion for summary judgment, and

opposed the Corporation's motion for summary judgment.  ECF No.

27.  On March 19, 2012, the Corporation filed a reply in further

support of its motion for summary judgment.  ECF No. 28.

II. Analysis

  A. Standard of Review

    The Court "shall grant summary judgment if the movant shows

---

[14] 15 U.S.C. § 1125(a)(1)(A) & (B).

[15] 15 U.S.C. § 1125(d)(1).

[16] Cole has sworn that, on September 14, 2011, he received an
email from a representative of Nationwide Insurance, the LLC's
insurance provider, who believed she was communicating with the
LLC about its insurance claim related to this lawsuit.  Cole
Decl. ¶ 31.  The Corporation did not submit a copy of the email
with its summary judgment materials.  Cole has also sworn that
the Corporation has received a tax form from the City of Long
Branch, N.J., declaring income paid to the Corporation in tax
year 2011.  Cole Decl. ¶ 33.  The Corporation assigned the Long
Branch contract to the LLC under the Stock Redemption Agreement.
*Id.*

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

When cross motions for summary judgment are filed, "each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." *Mellen*, 327 F.3d at 363 (*citing Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

B. The Defendants' Motion for Summary Judgment

The Defendants have moved for summary judgment on all counts.

1. Trademark Infringement Under the Lanham Act (Count I)[17]

In Count I, the Corporation alleges that the LLC's use of "BBP" and "BBP LLC"--and its representations about its clients, testimonials, practice areas, and awards and recognitions-- violate the Lanham Act because they will likely cause confusion about the LLC's affiliation with the Corporation, the origin of the LLC's services, and the Corporation's approval of the LLC's services. *See* Compl. ¶¶ 99-102.

To prevail on its trademark infringement claim, the Corporation must prove that (1) it owns a valid mark, (2) the Defendants "used the mark in commerce and without [the Corporation's] authorization," (3) the Defendants "used the mark (or an imitation of it) in . . . the sale, offering for sale, distribution, or advertising of goods or services," and (4) the Defendants' use of the mark "is likely to confuse consumers." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012). A mark includes "any word, name, [or] symbol" used by a company "to identify and distinguish the services" of the entity

---

[17] The complaint captions Count I as "Trademark Infringement and Unfair Competition in Violation of . . . the Lanham Act[.]" Trademark infringement is merely "part of the broader law of unfair competition." *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 428 (2003).

"from the services of others[,] and to indicate the source of the services."   15 U.S.C. § 1127.

The Defendants argue that they are entitled to judgment as a matter of law on Count I because the Corporation does not own "BBP" or "BBP LLC," nor can it show that the Defendants' use of those marks is likely to confuse consumers.   ECF No. 22-1 at 17.

a. Ownership of the Marks

The Defendants contend that the Corporation transferred "most or all of the goodwill associated with [marks such as 'BBP' and 'BBP LLC']" under the Stock Redemption Agreement, so "any rights [the Corporation] may have had in the marks were either . . . transferred to [the] Defendants or abandoned."   ECF No. 22-1 at 8.

The Corporation counters that it transferred only the personal goodwill of Basile and Prost, and retained ownership of its corporate goodwill and marks.   ECF No. 23-1 at 22-27.   The Corporation argues that it has continued to use "BBP" and "BBPA," and "[the LLC's] use of 'BBP' and 'BBP LLC' [is] confusingly similar to 'BBPC.'"   *Id.* at 22 & n.c.

Goodwill is "the total of all the imponderable qualities that attract customers to [a] business."[18]   "There may be

---

[18] *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 556 (1993).   *See also United States v. Winstar Corp.*, 518 U.S. 839, 849 n.5 (1996) (goodwill is "the advantage or benefit, which is acquired by an establishment, beyond the mere value of the

business or professional goodwill, or both combined in one enterprise." 1 *Callman on Unfair Competition, Trademarks and Monopolies* § 1:11 (4th ed.). Professional, or personal goodwill, "is good will that is based on the personal attributes of the individual such as personal skill, training, or reputation."[19] In Maryland, the concept of personal goodwill most often arises in cases involving the distribution of property in divorce,[20] or covenants not to compete.[21]

"If . . . consumer satisfaction and preference is labeled

---

capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances, or necessities, or even from ancient partialities, or prejudices") (internal quotation marks omitted) (*quoting* J. Story, *Law of Partnership* § 99, p. 139 (1841)).

[19] 38 Am. Jur. 2d *Good Will* § 4. *See also Callman* § 1:11 ("Professional activity which is dependent solely upon personal skill and ability (such as the practice of a doctor, lawyer, accountant, broker etc.) can obtain goodwill in much the same way as a business.").

[20] *See, e.g., Strauss v. Strauss*, 647 A.2d 818, 827 (Md. Ct. Spec. App. 1994) ("the value of personal goodwill is not subject to distribution or inclusion in a marital award").

[21] *See, e.g., Ecology Servs., Inc. v. Clym Envt'l Sevs., LLC*, 952 A.2d 999, 1008 (Md. Ct. Spec. App. 2008) ("covenants not to compete are justified if part of the compensated services of the former employee consisted in the creation of the good will of customers and clients which is likely to follow the person of the former employee") (internal quotation marks omitted). *See also Pritzker v. Stern*, 51 A.2d 69, 72 (Md. 1947) (describing personal goodwill as "the sense of an obligation of each partner not to compete by soliciting former customers").

'good will,' then a trademark is the symbol by which the world can identify that good will." 1 *McCarthy on Trademarks and Unfair Competition* § 3:2 (4th ed.). "A sale of a business and of its good will carries with it the sale of the trademark used in connection with the business, although not expressly mentioned in the instrument of sale."[22]

The parties' dispute about what the Corporation transferred in the Stock Redemption Agreement raises an issue of contract interpretation. "Under Maryland law, the interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law."[23] "The first step for a court asked to grant summary judgment based on a contract's interpretation is . . . to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face."

---

[22] *Nat'l Bd. for Certification in Occupational Therapy, Inc. v. Am. Occupational Therapy Ass'n*, 24 F. Supp. 2d 494, 500 (D. Md. 1998) (*citing President Suspender Co. v. Macwilliam*, 238 F. 159, 162 (2d Cir. 1916), *cert. denied*, 243 U.S. 636 (1917)).

[23] *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) (internal quotation marks omitted). Maryland law applies, because Maryland is the forum state, and the parties agreed in the Stock Redemption Agreement that Maryland law would apply. *See Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011) ("When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state."); *Henry v. Gateway, Inc.*, 979 A.2d 287, 297 (Md. Ct. Spec. App. 2009) ("Maryland appellate courts have long recognized the ability of parties to specify in their contracts which state's law will apply."); ECF No. 22-1, Ex. 2 at § 11.5.

*Wash. Metro. Area Transit. Auth. v. Potomac Inv. Props., Inc.*,
476 F.3d 231, 234 (4th Cir. 2007). A writing is ambiguous if it
is "susceptible to two reasonable interpretations." *Id.* When a
contract is ambiguous, the Court may examine extrinsic evidence
included in the summary judgment materials. *Id.* "If, however,
resort to extrinsic evidence . . . leaves genuine issues of fact
respecting the contract's proper interpretation, summary
judgment must . . . be refused and interpretation left to the
trier of fact." *Id.*

The Stock Redemption Agreement is unambiguous in at least
one respect: it was not a sale of the Corporation's entire
business and goodwill. Although Basile and Prost acquired
certain assets--including 83 jobs, 138 leads and proposals, and
the "goodwill [they] created on [certain] past contracts and
clients"--the Corporation retained all other assets, including
the company name and location, two-thirds of the staff, and 70
percent of the Corporation's contracts by revenue. ECF No. 22-
1, Ex. 2 at § 2.2.1, Schedule 2.2.1 (Revised); Cole Decl. ¶ 44.
Thus, the agreement was not a "sale of a business and . . . its
good will" that impliedly transferred the Corporation's
trademarks.[24]

---

[24] *See Nat'l Bd. for Certification in Occupational Therapy, Inc.*,
24 F. Supp. 2d at 500. The Defendants have cited--and the Court
has found--no case that holds that a company necessarily
transfers its trademarks when it sells anything less than its

The Defendants argue alternatively that the Corporation abandoned marks such as "BBP" and "BBP LLC" by transferring certain assets and agreeing not to compete with Basile and Prost for four years.  ECF No. 22-1 at 11-12.  They argue that, "because [the Corporation] has abandoned [business from state and local government entities], it has likewise abandoned the appurtenant trademarks . . . and cannot now claim to be their owner."  *Id.* at 12.

A company abandons its trademark when it stops using the mark and has no intention of resuming its use in the reasonably foreseeable future.  *See George & Co., LLC v. Imagination Entertainment Ltd.*, 575 F.3d 383, 400 (4th Cir. 2009).  "Once abandoned, a mark returns to the public domain and may, in principle, be appropriated for use by others in the marketplace[.]"  *Id.*  "The ultimate burden of proof remains always on the party claiming a mark has been abandoned."  *Id.* at 401.

The Defendants have not met that burden.  It is undisputed that the Corporation uses the website www.bbpa.com and the mark "BBPC," and Cole has sworn that the Corporation still refers to itself as "BBP" and "BBPA," especially among clients "with longstanding relationships with the firm."  Cole Decl. ¶¶ 5-6.  Thus, the Defendants have not shown that the Corporation has

entire business and goodwill.

stopped using the marks at issue. *See George & Co., LLC*, 575 F.3d at 400. Even if the Defendants had made that showing, they have failed to show that the Corporation has no intention of using the marks in the reasonably foreseeable future. *See id.* The Corporation continues to provide "real estate development, economics[,] and financial advisory services" to governments and institutional clients. *See* www.bbpa.com/about-us (last visited June 1, 2012). Although the Defendants argue that the Corporation has abandoned work with local and state governments, one could reasonably read the Stock Redemption Agreement to bar the Corporation only from soliciting certain clients of Basile and Prost's for four years. *See* ECF No. 22-1, Ex. 2 at § 8.1.

Because the Defendants have not shown that the Corporation owns no valid marks, they are not entitled to summary judgment on that basis.

### b. Likelihood of Confusion

The Defendants argue that, even if the Corporation owns valid marks, the Defendants' use of "BBP" or "BBP LLC" will not cause confusion; the Corporation handles federal clients, while the Defendants' clients are state and local governments. ECF No. 22-1 at 12. The Defendants also argue that the Corporation has failed to show any actual client confusion over the first two years of the LLC's existence. *Id.* at 13.

The Corporation counters that the Defendants are

competitors providing substantially similar services, the
Defendants intended to confuse consumers, and there have been
many instances of actual confusion.  ECF No. 23-1 at 27-33.

"A likelihood of confusion exists if the [D]efendant[s']
actual practice is likely to produce confusion in the minds of
consumers about the origin of the goods or services in
question." *George & Co., LLC*, 575 F.3d at 393 (internal citation
and quotation marks omitted).  The Fourth Circuit has identified
nine factors for assessing the likelihood of confusion:

> (1) the strength or distinctiveness of the plaintiff's
> mark as actually used in the marketplace; (2) the
> similarity of the two marks to consumers; (3) the
> similarity of the goods or services that the marks
> identify; (4) the similarity of the facilities used by
> the markholders; (5) the similarity of advertising
> used by the markholders; (6) the defendant's intent[25];
> (7) actual confusion; (8) the quality of the
> defendant's product; and (9) the sophistication of the
> consuming public.

*Id.*  The factors "are not meant to be a rigid formula for
infringement," but only a "catalog of various considerations
that may be relevant in determining the . . . likelihood of
confusion."  *Id.* (internal quotation marks omitted) (*quoting
Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320
(4th Cir. 1992)).

---

[25] "[I]ntent to confuse" is "strong evidence establishing
likelihood of confusion, since one intending to profit from
another's reputation generally attempts to make his signs,
advertisements, etc., to resemble the other's."  *George & Co.,
LLC*, 575 F.3d at 397.

A reasonable jury could find that the Defendants' use of "BBP" or "BBP LLC" is likely to cause consumer confusion. The Corporation has used "BBPC" since 2006, *see* Answer ¶ 31, and "BBP" is identical but for one letter. The Corporation and LLC are based in Annapolis and arguably perform similar work: economics and real estate consulting. *See* www.bbpa.com/about-us (last visited June 1, 2012); Basile Decl. ¶ 8; Answer ¶¶ 6, 24. The LLC's advertising has been similar to the Corporation's. Until May 24, 2010, the LLC's letterhead and business cards used a logo with font, colors, and layout nearly identical to the Corporation's logo. *See* ECF no. 23-1, Ex. O, P, Q, R, UU. On its website, the LLC has listed endorsements that are nearly verbatim to those in the Corporation's marketing materials. ECF No. 23-1, Ex. BB, CC. The LLC's website has also presented the same list of awards--in the same order and font, and accompanied by the same photos--as those used in the Corporation's advertisements. *See* ECF No. 23-1, Ex. EE, FF.

A reasonable jury could also find that the Defendants intended to confuse consumers. The LLC's name uses "BBP," which Prost asserts is an acronym identifying Basile and Prost. *See* Prost Dep. 153:1-6. But a reasonable jury could find that the second "B" in "BBP" refers to Baumann, who has never been affiliated with the LLC. *See* Answer ¶ 22. Baumann worked for the Corporation, which still identifies itself with his name.

*See* Prost Dep. 29:2-10; Basile Decl. ¶ 4.

The Defendants have also made several representations that could reasonably be construed as attempts to present the LLC as the Corporation.  In an email to an employee, Basile said that the Corporation had been "legally restructured, resulting in the formation of [the LLC]."  Email from Ralph Basile to Taylor Yewell, Jim Prost & David Starnes (Jan. 5, 2010 11:02 a.m.).  In several bids for work, the LLC has said that it existed long before its January 2010 formation, and its marketing materials have claimed that the LLC has completed projects that were done by Basile and Prost when they were principals at the Corporation.  *See, e.g.*, ECF No. 23-1, Ex. Y, LL, MM.  In August 2011, the LLC's website stated that it had provided services to "literally hundreds of clients" when it had advised "far fewer" than 70 to 80 clients.  ECF No. 23-1, Ex. X at BBPC 1523; Basile Dep. 229:12-17, 231:7-13.

The Corporation has also presented evidence that several of the LLC's clients sent payments to the Corporation, the Corporation has received mail intended for the LLC, someone has emailed the Corporation to ask about a project touted in the LLC's newsletter, and the Planning Authority may have confused the LLC with the Corporation.  ECF No. 22-1, Ex. TT, Sumner Dep. 47:7-49:8; Cole Decl. ¶¶ 28-30; Tina Dolen Decl., Ex. B. Regardless of whether such incidents were actual consumer

31

confusion, they are further evidence from which a reasonable jury could find a likelihood of confusion.

In sum, a genuine dispute exists as to whether the Defendants' use of "BBP" and "BBP LLC" is likely to cause confusion, because a reasonable jury could find that the LLC's marks, services, and advertising are similar to the Corporation's, and the LLC intended to confuse consumers. *See George & Co., LLC*, 575 F.3d at 393. Accordingly, the Court will deny the Defendants' motion for summary judgment on Count I.[26]

2. False Advertising Under the Lanham Act (Count II)

In Count II, the Corporation alleges that the LLC's representations about its clients, testimonials, projects, and awards and recognitions constitute false advertising under the Lanham Act. Compl. ¶¶ 112-113.

The Lanham Act prohibits "false or misleading description . . . or representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of [its] or another [entity's] goods, services, or commercial activities." 15 U.S.C. 1125(a)(1)(B). A plaintiff must show:

---

[26] The Corporation argues that the LLC's motion for summary judgment fails to address the false designation of origin claim in Count I. ECF No. 23-1 at 33. Although the Court need not address this argument, it notes that Lanham Act claims of infringement and false designation of origin have the same five elements. *See Lamparello*, 420 F.3d at 313.

(1) the defendant made a false or misleading
description of fact or representation of fact in a
commercial advertisement about his own or another's
product; (2) the misrepresentation is material, in
that it is likely to influence the purchasing
decision; (3) the misrepresentation actually deceives
or has the tendency to deceive a substantial segment
of its audience; (4) the defendant placed the false or
misleading statement in interstate commerce; and (5)
the plaintiff has been or is likely to be injured as a
result of the misrepresentation, either by direct
diversion of sales or by a lessening of goodwill
associated with its products.[27]

The Defendants argue that they are entitled to judgment as

a matter of law because the Corporation cannot show that any of

the statements on the LLC's website were material, or that the

Corporation has been injured as a result of the LLC's

statements.   ECF No. 22-1 at 21-27.

      a. Materiality

A statement is material if it describes a product or

service as having a characteristic that most consumers would

find appealing.[28]

-----

[27] *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th
Cir. 2011).   When, as here, the complaint seeks injunctive
relief, *see* Compl. ¶ 121, the plaintiff must show that the
injury is irreparable, *see PBM Prods., LLC*, 639 F.3d at 120.

[28] *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, Case No. MJG-
06-2662, 2011 WL 4596043, at *16 (D. Md. Sept. 30, 2011) ("Made
in America" claim was material because, "[e]ven if a buyer
merely preferred to buy products made in the United States, the
claim [was] likely to influence the buyer"); *Sanderson Farms,
Inc. v. Tyson Foods, Inc.*, 547 F. Supp. 2d 491, 507 (D. Md.
2008) (claim that chickens were "Raised Without Antibiotics" was
material because "[n]ine out of ten consumers considered it
important to have antibiotic-free chicken, and a claim of

The Corporation has presented evidence of statements on the LLC's website claiming that:

- the LLC had served about 600 clients, when the majority of those clients had been served by the Corporation, *see* ECF No. 23-1, Ex. W; Basil Dep. 229:12-17, 231:7-13;

- the LLC had served "literally hundreds of clients" when it had served "far fewer" than 70 or 80, *see* ECF No. 23-1, Ex. X at 6, Basile Dep. 229:12-17, 231:7-13;

- the LLC had accomplished "a number of 'firsts'" in its industry, when each of the claimed "firsts" had been accomplished before the LLC's formation, *see* ECF No. 23-1, Ex. X at 3-4, Answer ¶ 60;

- the LLC had completed 45 projects, when it had only completed eight and the rest were done by the Corporation, *see* ECF No. 23-1, Ex. Y; Basile Dep. 245:8-246:5; Cole Decl. ¶ 41;

---

antibiotic-free chicken [was] the second most important claim that consumers looked for when shopping for chicken"). *See also Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, Case No. 3:10-877-HEH, 2011 WL 2938483, at *4 (E.D. Va. July 19, 2011) (statements were material because they were "aimed at promoting [the product] as . . . exclusive"); *Scotts Co. v. Pursell Indus., Inc.*, Case No. 3:02-240, 2002 WL 34528439, at *4 (E.D. Va. July 2, 2002) (image of a mature crabgrass plant on the container of crabgrass control product was material because "[c]onsumers looking to purchase a crabgrass control product would undoubtedly be looking for . . . a product that kills crabgrass plants that have already germinated," and the graphic "suggest[ed] that the product kill[ed] mature plants").

- clients had praised the work of the LLC, when the testimonials actually described work by the Corporation, *see* ECF No. 23-1, Ex. BB, CC; and

- the LLC had received awards, when the recognitions had been awarded for work done by the Corporation, *see* ECF No. 23-1, Ex. EE, FF.

The Defendants argue that none of the alleged misrepresentations is material because "[n]o customer would 'purchase' [the LLC's] services by reading the literature at its website and then clicking a button." ECF No. 22-1 at 22. "Instead," the LLC argues, "potential clients [would] use the website, at most, as a way to become generally familiar with [the LLC] and the services it provides." *Id.* The LLC contends that, only after contacting the Defendants directly, would a customer buy its services. *Id.*

The Corporation counters that the LLC's argument "defies common sense." ECF No. 23-1 at 35. It argues that, "if [the LLC's] website had no effect on developing client business," it would not "expend the effort needed to implement and sustain [the] website." *Id.*

A reasonable jury could find that the statements on the LLC's websites were material. A consumer seeking consulting services would likely be persuaded by a vendor's claims that it had served hundreds of clients, worked on dozens of projects,

received accolades from past clients, and been awarded for its

work.   Thus, the statements all related to characteristics that

a consumer would be seeking in a consulting firm.   *See, e.g.,*

*Sanderson Farms, Inc.*, 547 F. Supp. 2d at 507.   Moreover,

materiality is generally a question of fact for the jury.[29]

Accordingly, it is not a basis for summary judgment.

> b. Injury

The Defendants also argue that the Corporation has failed

to produce any evidence that it has been injured by the alleged

misrepresentations.   ECF No. 22-1 at 22-24.   The Corporation

counters that the Defendants' motion for summary judgment is

premature because it was filed before discovery ended.   ECF No.

23-1 at 35-36.

The Defendants are not entitled to summary judgment on

Count II.   To prevail on a false advertising claim, a plaintiff

must show, *inter alia*, that it "has been *or is likely to be*

injured as a result of the misrepresentation."   *PBM Prods., LLC*,

639 F.3d at 120 (emphasis added).   A plaintiff meets this burden

by showing actual or likely "lessening of goodwill associated

with its products" or "direct diversion of sales."   *Id.*

Evidence that the defendant's advertising tended to mislead or

---

[29] *Cf. Dunn v. Borta*, 369 F.3d 421, 427 (4th Cir. 2004) ("the
materiality of a statement" in a securities fraud case "is a
question of fact that should normally be left to a jury").

confuse consumers may establish harm.[30]

A reasonable jury could find that the LLC's statements would likely injure the Corporation.  The record includes evidence that the LLC's website contained misleading statements that could confuse consumers.  *See supra* Parts II.B.1.b & 2.a. From this same evidence, a jury could reasonably find that the Corporation could suffer diversion of sales or lessening of its goodwill.[31]  Accordingly, the Court will deny the Defendants' motion for summary judgment on Count II.[32]

---

[30] *See, e.g., JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.*, 128 F. Supp. 2d 926, 948 (E.D. Va. 2001) ("[A] demonstration that the competitor's advertising tends to mislead consumers satisfies the [Lanham] Act's irreparable harm requirement."), *aff'd in part, vacated in part, and remanded*, 28 F. App'x 207 (4th Cir. 2002); *Black & Decker (U.S.) Inc. v Pro-Tech Power Inc.*, 26 F. Supp. 2d 834, 862 (E.D. Va. 1998) ("Courts have explained that a demonstration that the competitor's advertising tends to mislead consumers satisfies the Lanham Act's irreparable harm requirement.").  The Fourth Circuit has not decided "whether and under what circumstances a presumption of irreparable harm should be applied in false advertising cases." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273-74 (4th Cir. 2002).

[31] *See PBM Prods., LLC*, 639 F.3d at 120; *JTH Tax, Inc.*, 128 F. Supp. 2d at 948; *Black & Decker (U.S.) Inc.*, 26 F. Supp. 2d at 862.  The jury could also reasonably find that such harm is irreparable, as required for injunctive relief.  *See id.*

[32] The Defendants' remaining arguments for summary judgment on Count II are not persuasive.  First, the Defendants argue that "[t]he facts of this case make clear that [the LLC's] only intention in posting the representations complained of was to display the achievements of Basile and Prost." ECF No. 22-1 at 20 (emphasis omitted).  But intent to deceive is not an element of a false advertising claim under the Lanham Act. *See PBM Prods., LLC*, 639 F.3d at 120.  Second, the Defendants argue that

3. Registration and Use of Domain Name in Violation of the
   ACPA (Count III)

In Count III, the Corporation alleges that the LLC has
tried to profit from the Corporation's marks and divert its
customers by registering and using bbpallc.com, which the
Corporation asserts is confusingly similar to its marks. Compl.
¶¶ 122-135.

To establish a violation of the ACPA, a plaintiff must show
that (1) the defendants had a bad faith intent to profit from
using their internet domain name, and (2) the domain name is
identical or confusingly similar to, or dilutive of, the
plaintiff's distinctive and famous mark. *See Newport News
Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 434
(4th Cir. 2011).

In determining whether bad faith exists, the Court must
view "the totality of the circumstances," *id.* at 435, and
consider such factors as whether the domain name consists of a
name commonly used to identify the defendants, or the defendants
intended to divert consumers from the plaintiff's site by

---

the Corporation has not shown that it is entitled to monetary
damages.  ECF No. 22-1 at 25-26.  But whether a plaintiff has
established a violation of the Lanham Act is a separate inquiry
from whether the plaintiff is entitled to damages. *See Xoom,
Inc. v. Imageline, Inc.*, 323 F.3d 279, 286 (4th Cir. 2003) ("To
recover damages under the Lanham Act, [the plaintiff] must first
establish that there has been a Lanham Act violation[.]"),
*abrogated in part on other grounds by Reed Ellsevier, Inc. v.
Muchnick*, 130 S. Ct. 1237 (2010).

creating a likelihood of confusion about the "source,

sponsorship, affiliation, or endorsement of the [defendant's]

site," 15 U.S.C. § 1125(d)(1)(B)(i).[33]   Courts "do not simply

---

[33] The ACPA lists nine non-exclusive factors for courts to consider in determining whether bad faith exists:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

count up which party has more factors in its favor," because the factors are not "a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit." *Lamparello*, 420 F.3d at 319-20 (internal citations and quotation marks omitted).

The Defendants argue that they are entitled to judgment as a matter of law because the Corporation has presented no evidence of the Defendants' bad faith. ECF No. 22-1 at 27. They contend that Basile and Prost are entitled to the goodwill they created with former clients, the LLC's domain name "is comprised of Basile and Prost's initials," they have not registered multiple domain names or offered to transfer the LLC's domain name, and they provided no false information when registering the domain name. *Id.* at 28. They further argue that bbpallc.com is neither identical nor confusingly similar to

---

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of the registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).  "[B]ecause use of these listed factors is permissive," the Court "need not . . . march through them all in every case." *Lamparello*, 420 F.3d at 319 (internal quotation marks omitted).

any mark owned by the Corporation.  *Id.* at 27-28.

A reasonable jury could find that the Defendants had a bad faith intent to profit from bbpallc.com and that the domain name is confusingly similar to the Corporation's marks.  The LLC's domain name ("bbpallc.com") is identical to the Corporation's, ("bbpa.com"), but for three letters ("llc").[34]  Although "bbpallc" includes two letters that correspond to the names Basile and Prost, it also includes an additional "b," which jurors could reasonably find corresponds to Baumann.  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(II).  Baumann, once a principal of the Corporation, has never been affiliated with the LLC.  *See* Answer ¶ 22.

The evidence also shows that Basile and Prost left the Corporation to form the competing LLC, the LLC provides substantially similar services, both the Corporation and the LLC are located in Annapolis, and the LLC's website has posted lists of awards and client testimonials that were verbatim or nearly identical to lists in the Corporation's marketing materials. *See* www.bbpa.com/about-us; Basile Decl. ¶ 8; Answer ¶¶ 6, 24; ECF No. 23-1, Ex. BB, CC, EE, FF.  From this, a jury could

---

[34] The Court is not persuaded by the Defendants' argument that no similarity exists because results of a Google search of "BBP" do not include the Corporation's site.  *See* ECF No. 22-1 at 29.  On June 1, 2012, the first two results for a Google search of "BBP Annapolis" were links to the LLC's site; the third result was a link to the Corporation's site.

reasonably infer that the Defendants intended to divert customers from the Corporation by creating a likelihood of confusion about the source of the LLC's site.[35]  Thus, the Court will deny the Defendants summary judgment on Count III.

4. State Law Claims (Counts IV-VI)

The Defendants argue that the Court should decline to exercise supplemental jurisdiction over the remaining claims,[36] which allege trademark infringement, unfair competition, and conversion and/or misappropriation, in violation of Maryland common law.  Compl. 15-17.

When a district court "has dismissed all claims over which it has original jurisdiction," it "may decline" to exercise supplemental jurisdiction over remaining state law claims.  28 U.S.C. § 1367(c).  But the Court has not dismissed all federal claims.  Accordingly, § 1367(c) is inapplicable, and the Court will deny summary judgment on Counts IV-VI.

C. The Corporation's Cross Motion for Summary Judgment

The Corporation has cross-moved for summary judgment on Count I, trademark infringement under the Lanham Act.  As stated above, to prevail on its trademark infringement claim, the

---

[35] *See, e.g.*, *Carnivale v. Staub Design LLC*, 456 F. App'x 104, 107 (3d Cir. 2012) (intent to divert could be inferred from evidence "tending to show actual customer overlap or competition between the plaintiff's and the defendant's businesses").

[36] *See* ECF No. 22-1 at 30-33.

Corporation must prove that (1) it owns a valid mark, (2) the Defendants "used the mark in commerce and without [the Corporation's] authorization," (3) the Defendants "used the mark (or an imitation of it) in . . . the sale, offering for sale, distribution, or advertising of goods or services," and (4) the Defendants' use of the mark "is likely to confuse consumers." *Rosetta Stone Ltd.*, 676 F.3d at 152.

On the Corporation's cross-motion for summary judgment, the Court must accept the Defendants' evidence as true, and draw all reasonable inferences in the Defendants' favor. *See Dennis*, 290 F.3d at 645. The Court may grant summary judgment to the Corporation only if the evidence is "so one-sided that [the Corporation] must prevail as a matter of law." *Anderson*, 447 U.S. at 251-52. If the evidence permits either of two reasonable conclusions, however, the jury must resolve the dispute. *Id.* at 250-51.

The Corporation has not shown that it is entitled to summary judgment. Although a reasonable jury could find a likelihood of consumer confusion, *see supra* Part II.B.1.b, the jury could also reasonably find that no such confusion is likely. The Corporation and the LLC consult clients about real estate and economics, but the LLC's business focuses mainly on state and local government, while the Corporation's business

remains primarily focused on the U.S. Navy.[37]

Because neither company targets the public at large, a reasonable jury could find that the typical consumer in the relevant market is sophisticated enough to distinguish the LLC from the Corporation.[38]  That some of the LLC's clients sent payments to the Corporation, *see* ECF No. 22-1, Ex. TT, does not establish that they were confused because of the Defendants' marks, *see Rosetta Stone Ltd.*, 676 F.3d at 152.  The misdirected payments were made shortly after the Corporation transferred client contracts to Basile and Prost, and may have resulted from the recency of the transition.  Although the Corporation presented evidence of confusion in the Planning Authority bid process,[39] an LLC client's tax form,[40] by a potential client who had received the LLC's newsletter,[41] and by the LLC's insurance carrier,[42] "[e]vidence of only a small number of instances of

---

[37] ECF No. 22-1, Ex. 5 at 6; Cole Dep. 160:14-18; *George & Co., LLC*, 575 F.3d at 393 (similarity of services is one factor to consider in determining whether consumer confusion is likely).

[38] *See Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, ("Although no one factor is dispositive of the 'likelihood of confusion' inquiry, the sophistication and expertise of the usual purchasers can preclude any likelihood of confusion among them stemming from the similarity of trade names.").

[39] *See* Tina Dolen Decl., Ex. B.

[40] *See supra* note 15.

[41] *See* Cole Decl. ¶ 30.

[42] *See supra* note 15.

actual confusion may be dismissed as *de minimis*." *George & Co., LLC*, 575 F.3d at 398 (4th Cir. 2009).

A jury could reasonably find that another factor--the Defendants' intent[43]--does not show any likelihood of confusion. The Defendants presented evidence that they sent out a mass email distinguishing the LLC from the Corporation. ECF No. 22-1, Ex. 5 at 6. They also changed the LLC's website and logo when the Corporation complained of possible confusion. Letter from Daniel J. Mellin to Michael J. Bevilacqua (May 31, 2010). From this, a jury could reasonably conclude that the Defendants did not intend to confuse consumers.

In sum, the Corporation has presented evidence from which a jury could find that the Defendants infringed the Corporation's mark, in violation of the Lanham Act. *See supra* Part II.B.1. But the evidence does not compel such a finding, and a jury could reasonably find no infringement. Thus, the Court must deny the Corporation's motion for summary judgment on Count I. *See Anderson*, 447 U.S. at 250-52.

---

[43] *See George & Co., LLC*, 575 F.3d at 393.

III. Conclusion

For the reasons stated above, the Court will deny the Defendants' motion for summary judgment, and the Corporation's cross-motion for summary judgment.

___6/18/12___
Date

_____
William D. Quarles, Jr.
United States District Judge